**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAYMOND GREENLEE, derivatively on behalf of MACQUARIE INFRASTRUCTURE CORPORATION, | Case No.: |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| JAMES HOOKE, JAY DAVIS, LIAM STEWART, RICHARD D. COURTNEY, MARTIN STANLEY, NORMAN H. BROWN, JR., GEORGE W. CARMANY III, RONALD KIRK, H.E. LENTZ, and OUMA SANANIKONE, | **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) UNJUST ENRICHMENT; AND**<br>**(4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** |
| Defendants, | |
| and | |
| MACQUARIE INFRASTRUCTURE CORPORATION, | **JURY TRIAL DEMANDED** |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Raymond Greenlee ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Macquarie Infrastructure Corporation ("Macquarie" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants James Hooke, Jay Davis, Liam Stewart, Martin Stanley, Norman H. Brown, Jr., George W. Carmany III, Ronald Kirk, H.E. Lentz, and Ouma Sananikone (collectively, the "Individual Defendants," and together with Macquarie, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Macquarie, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Richard D. Courtney for aiding and abetting breaches of fiduciary duties.  As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Macquarie, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Macquarie's directors and officers from February 22, 2016 through the present (the "Relevant Period").

2.      Macquarie is a Company that owns and operates a diversified portfolio of infrastructure and infrastructure-like businesses.  The Company's portfolio of businesses provides services to other businesses, government agencies, and individuals primarily in the United States.

3.      The businesses that Macquarie owns and operates are organized into four segments: International-Matex Tank Terminals ("IMTT"), Atlantic Aviation, Contracted Power, and MIC Hawaii.  The Company's IMTT segment is a business providing bulk liquid terminalling to third parties at 17 terminals in the U.S and two in Canada.[1]

4.      On February 21, 2018, Macquarie issued a press release announcing disappointing earnings for the fourth quarter ended December 31, 2017, and providing guidance of a dividend of $1.00 per share in the first quarter 2018—approximately 31% less than the Company's fourth quarter dividend of $1.44 per share.  The press release moreover attributed a reduced forecast in IMTT to a "consequence of global shifts in refined petroleum product production and consumption that have reduced demand for residual and heavy oil and trading activity related to those products."

5.      On this news, the price per share of Macquarie stock fell $26.21 per share, or approximately 41.2%, from the previous day's closing price, closing at $37.41 per share on February 22, 2018.

6.      During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and prospects.

7.      In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

---

[1] Bulk liquid terminals provide vital logistics services to vertically integrated petroleum product producers and refiners, chemical manufacturers, food processors and commodity traders. Customers typically pay terminal operators such as IMTT on an 'availability' basis to provide tank capacity, loading and unloading access, and pipeline and trans-loading capacity, and also pay additional fees for ancillary services such as heating and blending.

8.      Moreover, the Individual Defendants, in breach of their fiduciary duties owed to Macquarie, willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls.

9.      As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

10.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its former Chief Executive Officer ("CEO"), its Head of Investor Relations and Vice President, its Chief Financial Officer ("CFO"), and the CEO of IMTT to two federal securities fraud class action lawsuits pending in this Court (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

4

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and Defendant Richard D. Courtney's aiding and abetting thereof.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

5

19.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Macquarie. Plaintiff has continuously held Macquarie common stock at all relevant times.

### Nominal Defendant Macquarie

21.     Macquarie is a Delaware corporation with its principal executive offices at 125 West 55th Street, New York, New York 10019. Macquarie's shares trade on the NYSE under the ticker symbol "MIC."

### Defendant Hooke

22.     Defendant James Hooke ("Hooke") served as the Company's CEO from May 2009 to December 2017.  He also served as a Company director from September 2017 to September 2018.  According to the Company's Schedule 14A filed with the SEC on March 24, 2017 (the "2017 Proxy Statement"), as of March 22, 2017, Defendant Hooke beneficially owned 71,576 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Hooke owned over $5.6 million worth of Macquarie stock.

23.     For the fiscal year ended December 31, 2017, Defendant Hooke received $5,134,217 in compensation from the Company. This included $400,000 in salary, a $4,100,000 bonus, $422,167 in stock awards, and $212,050 in all other compensation.

24.    The Company's 2017 Proxy Statement stated the following about Defendant Hooke:

> ***James Hooke***[2] was appointed chief executive officer of the Company in May 2009. Mr. Hooke is seconded to the Company as chief executive officer by our Manager under the terms of our management services agreement. He joined the Macquarie Group in 2007 as a division director in the Macquarie Infrastructure and Real Assets unit of Macquarie Asset Management. Macquarie Asset Management is an operating division of the Macquarie Group. Effective July 1, 2010, Mr. Hooke was promoted to executive director.
>
> Prior to becoming chief executive officer of the Company, Mr. Hooke was responsible for the management of portfolio company investments in unlisted infrastructure funds responsible for investing and managing investor commitments across a range of North American businesses. Mr. Hooke was also responsible for the management of several portfolio company investments for other Macquarie affiliates and clients. Prior to joining Macquarie and since 2001, Mr. Hooke served in various senior management positions with Fairfax Media Limited, a newspaper publisher in Australia and New Zealand.

**Defendant Stewart**

25.    Defendant Liam Stewart ("Stewart") has served as the Company's CFO since June 2015. According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Stewart beneficially owned 2,781 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Stewart owned over $220,394 worth of Macquarie stock.

26.    For the fiscal year ended December 31, 2017, Defendant Stewart received $1,018,353 in compensation from the Company. This included $280,000 in salary, a $581,614 bonus, $124,911 in stock awards, and $31,828 in all other compensation.

27.    The Company's 2018 Proxy Statement stated the following about Defendant Stewart:

---

[2] Emphasis in original unless otherwise noted throughout.

***Liam Stewart*** was appointed chief financial officer of the Company effective June 30, 2015. He joined the Macquarie Group in April 2014 and served as asset director for the Company's Atlantic Aviation business. In addition, he led various holding company projects including the growth of the Contracted Power and Energy business, prior to becoming chief financial officer of the Company.

From 2009 through 2013, before joining Macquarie, Mr. Stewart served as senior vice president and management partner at Global Tower Partners, then a Macquarie-affiliated private real estate investment trust owning and operating cellular communications towers in the U.S., Mexico, Costa Rica and Panama. Prior to joining Global Tower Partners, Mr. Stewart was employed by Macquarie Group with responsibility for listed media and telecommunications investments in North America.

### Defendant Davis

28.     Defendant Jay Davis ("Davis") has served as the Company's Vice President and Head of Investor Relations since May 2005.

29.     The Company's 2017 Proxy Statement stated the following about Defendant Davis:

***Jay Davis*** joined the Company in May, 2005 and has primary responsibility for investor relations on behalf of the Company. In addition to his investor relations responsibilities, Mr. Davis serves as a non-executive officer of the majority of MIC's downstream entities.

Mr. Davis also advises Macquarie's fund management business in the Americas on investor relations matters across its portfolio of funds. Collectively, these funds own and operate infrastructure businesses with an aggregate equity value of approximately $15 billion.

Prior to joining Macquarie, Mr. Davis spent 22 years with the MONY Group, a provider of insurance and investment products and services, where he last served as Senior Vice President, Investor Relations. Prior to that, he was head of Corporate Development, and held a number of sales and sales management positions during his tenure with MONY.

### Defendant Stanley

30.     Defendant Martin Stanley ("Stanley") has served as the Company's Chairman since July 2014 and as a Company Director since July 2013.  According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Stanley beneficially owned 4,649,498 shares of the

Company's common stock, which represented 5.7% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Stanley owned over $368.4 million worth of Macquarie stock.

31.     The Company's 2017 Proxy Statement stated the following about Defendant Stanley:

> **Martin Stanley** has served as chairman of the Company since July 2013. Mr. Stanley is Global Head of the Macquarie Infrastructure and Real Assets division, which manages a significant global portfolio invested in sectors including airports, roads, rail, utilities, renewable energy, telecommunications, industrials, property and media. These assets are owned through a variety of listed and unlisted funds and co-investment vehicles. After joining Macquarie in 2004, Mr. Stanley was integral to the establishment of Macquarie's first European infrastructure fund (MEIF 1) and directed the acquisition and management of investments for MIRA's four European funds before being appointed Global Head in 2010. Mr. Stanley has directed significant transactions for MIRA including the acquisitions of Thames Water, a UK Water Company, and the take private of German energy service provider Techem AG. He has also established successful new business lines in the UK, Korea, China, India, the Philippines, Mexico and Brazil. Prior to joining Macquarie, Mr. Stanley was a director at TXU Europe Group Plc, the energy services company whose operations included the generation, supply and trading of electricity and gas. Mr. Stanley has 30 years of experience in the utility sector having started his career in 1986 with Manweb Plc, the regulated asset owner and license holder for the power distribution network covering Merseyside, Cheshire and North Wales.
>
> Mr. Stanley brings extensive knowledge of the infrastructure industry and its regulatory environment from his tenure in various leadership positions within the Macquarie Group. His understanding of the Group's international operations and new business development makes him well-placed to provide strategic direction and industry insight to the Company. Mr. Stanley's service on the investment committees of Macquarie Group managed vehicles affords him insight as to the valuation of infrastructure assets, their operations and key drivers in evaluating potential transactions.

**Defendant Brown**

32.     Defendant Norman H. Brown, Jr. ("Brown") has served as a Company director since December 2004, and is Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Governance Committee.  According to the Company's 2017

Proxy Statement, as of March 22, 2017, Defendant Brown beneficially owned 48,921 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Brown owned over $3.8 million worth of Macquarie stock.

33.     For the fiscal year ended December 31, 2017, Defendant Brown received $262,365 in compensation from the Company. This included $116,500 in fees earned or paid in cash and $145,865 in stock awards.

34.     The Company's 2017 Proxy Statement stated the following about Defendant Brown:

> ***Norman H. Brown, Jr.*** has served as a director of the Company since December 2004. He currently serves as a Member and Senior Managing Director of Brock Capital Group LLC, which provides investment banking services for early stage and middle market companies, a position he has held since December 2003. Mr. Brown's previous experience comprises over 30 years of experience in the investment banking business. During 2002 and 2003, Mr. Brown attended to private investments. From December 2000 to December 2001, he was Managing Director and Senior Advisor for Credit Suisse First Boston in the Global Industrial & Services Group with new business development responsibility for Latin America. During Mr. Brown's 15 years at Donaldson, Lufkin & Jenrette Securities Corporation, from June 1985 to December 2000, he was a member of the Mergers & Acquisitions Group, established and headed the Restructuring Group, and headed the Global Metals & Mining Group. Until December 2009, Mr. Brown was the lead independent director for W.P. Stewart & Co. Growth Fund, Inc.
>
> Mr. Brown brings in-depth knowledge of financial markets and broad leadership experience to our board of directors through his long tenure in the financial industry. His prior work and expertise in mergers and acquisitions and debt restructurings has allowed him to provide valuable advice on our past acquisitions and our efforts to strengthen our balance sheet. Mr. Brown's experience as an independent director and lead director for other companies provides him with unique insight on corporate governance matters, which he has shared with the Company.

**Defendant Carmany**

35.     Defendant George W. Carmany III ("Carmany") has served as a Company director since December 2004, and is Chair of the Nominating and Governance Committee and a member of the Audit Committee and the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Carmany beneficially owned 43,925 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Carmany owned over $3.4 million worth of Macquarie stock.

36.     For the fiscal year ended December 31, 2017, Defendant Carmany received $244,865 in compensation from the Company. This included $99,000 in fees earned or paid in cash and $145,865 in stock awards.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Carmany:

> **George W. Carmany, III** has served as a director of the Company since December 2004. Since 1995, he has served as President of G.W. Carmany and Co., Inc., which advises developing companies in the life sciences and financial services industries. Mr. Carmany is a Senior Advisor to EnGeneIc Ltd., Essex Woodlands, and served in a similar capacity with Brown Brothers Harriman and Co. until 2014. In 2010, he retired as a director of SunLife Financial, Inc. He is a director of Remedy Partners, LLC and is a member of the advisory committee on health care policy of the Harvard Medical School. From 1999 to 2001, he served as Chairman and Chief Executive of Helicon Therapeutics and continued to serve as Chairman of Helicon Therapeutics through August 2005. From 1996 to 1997, he also served as Chairman of the New England Medical Center Hospitals. Mr. Carmany's previous experience includes over 20 years at the American Express Company, where he held senior positions in its international banking, corporate and asset management divisions, and nine years at Bankers Trust Company.
>
> Mr. Carmany is an experienced executive and he adds an important dimension to our board's expertise through his considerable financial literacy and his work in advising developing companies. Mr. Carmany's experience and background allows him to provide oversight and advice on financial reporting and accounting matters. As an advisor to developing companies, Mr. Carmany encounters and advises on a

range of business, legal, risk management and financial issues. This experience has been valuable as our board has worked with our management team to address issues and manage risks arising out of the financial crisis and the slow economic recovery.

**Defendant Kirk**

38.     Defendant Ronald Kirk ("Kirk") has served as a Company director since November 2016, and is a member of the Nominating and Governance Committee, the Audit Committee, and the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Kirk beneficially owned 991 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Kirk owned over $78,536 worth of Macquarie stock.

39.     For the fiscal year ended December 31, 2017, Defendant Kirk received $235,865 in compensation from the Company. This included $90,000 in fees earned or paid in cash and $145,865 in stock awards.

40.     The Company's 2017 Proxy Statement stated the following about Defendant Kirk:

***Ronald Kirk*** has served as a director of the Company since November 2016. He currently serves as Senior Of Counsel with the law firm of Gibson, Dunn & Crutcher in its Dallas and Washington, D.C. offices, a position he has held since March 2013. He is Co-Chair of the International Trade Practice Group and a member of the Sports Law, Public Policy, Crisis Management and Private Equity Practice Groups. He also serves on the board of Texas Instruments (since 2013) and is a member of its Governance and Stockholder Relations Committee.

From March 2009 until March 2013, Mr. Kirk served as the 16th U.S. Trade Representative. His tenure as Trade Representative focused on the development and enforcement of U.S. intellectual property law in particular. Prior to serving as U.S. Trade Representative, Mr. Kirk was a partner of the Vinson & Elkins law firm. Mr. Kirk was the Mayor of Dallas, Texas from 1995 to 2001.

Mr. Kirk brings in-depth knowledge of legal, government and trade matters and broad leadership experience to our board of directors, through his extensive experience in the government and legal sectors. His international trade expertise allows him to provide valuable advice on potential acquisitions. Mr. Kirk's experience as an independent director for other large companies provides him with insight on corporate governance matters and best practices.

**Defendant Lentz**

41.     Defendant H.E. Lentz ("Lentz") has served as a Company director since August 2011, and is a member of the Nominating and Governance Committee, the Audit Committee, and the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Lentz beneficially owned 23,731 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Lentz owned over $1.8 million worth of Macquarie stock.

42.     For the fiscal year ended December 31, 2017, Defendant Lentz received $237,865 in compensation from the Company. This included $92,000 in fees earned or paid in cash and $145,865 in stock awards.

43.     The Company's 2017 Proxy Statement stated the following about Defendant Lentz:

***H.E. (Jack) Lentz*** has served as a director of the Company since August 2011. He also serves on the boards of Carbo Ceramics Inc. (since 2003), Peabody Energy Corporation (since 1998) and WPX Energy, Inc. (since 2012). He is a member of the audit committee and chair of the compensation committee of Carbo Ceramics Inc. and a member of the compensation committee of WPX Energy, Inc. From March 2009 until May 2011, Mr. Lentz was a Managing Director at Lazard Freres & Co. Between September 2008 and March 2009, he was a Managing Director at Barclays Capital. From 1993 until September 2008, he was a Managing Director at Lehman Brothers, where he headed the natural resources group (1993 – 1997) and was active in merchant banking. From 1988 to 1993, he was the Vice Chairman of Wasserstein Perella & Co. and head of its energy group. He started his career at Lehman Brothers in 1971.

Mr. Lentz is an experienced banker and board member with broad experience in the natural resources and energy industries, both of which are traditional infrastructure sectors. That experience allows him to inform our board on a wide range of governance, financial and operational issues, especially as they relate to the operations of our energy businesses, and the development of the Company's strategic direction.

**Defendant Sananikone**

44.     Defendant Ouma Sananikone ("Sananikone") has served as a Company director since February 2013, and is Chair of the Compensation Committee and a member of the Nominating and Governance Committee and the Audit Committee.  According to the Company's 2017 Proxy Statement, as of March 22, 2017, Defendant Sananikone beneficially owned 9,865 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 22, 2017 was $79.25, Sananikone owned over $781,801 worth of Macquarie stock.

45.     For the fiscal year ended December 31, 2017, Defendant Sananikone received $244,865 in compensation from the Company. This included $99,000 in fees earned or paid in cash and $145,865 in stock awards.

46.     The Company's 2017 Proxy Statement stated the following about Defendant Sananikone:

> ***Ouma Sananikone*** has served as a director of the Company since February 2013. Ms. Sananikone currently serves as a non-executive director of the Caisse de Depot et Placement de Quebec in Canada (since 2007), as well as Icon Parking (since 2006) in the USA. She was also a non-executive director of Moto Hospitality Services (from 2006 to 2009) and Air Serv Holdings (from 2006 to 2013). She was previously Chairman of Smarte Carte from 2007 to 2010 and of EvolutionMedia from 2003 to 2005. She also acted as Australian Financial Services Fellow for the USA on behalf of Invest Australia from 2005 to 2008.
>
> Ms. Sananikone served as director of State Super Corporation of NSW (Australia) from 2002 to 2005 and as a director of Babcock and Brown Direct Investment Fund (Australia) from 2002 to 2005. In addition, she was previously a Managing Director with responsibility for Corporate Strategy and Development at BT Financial Group, part of Westpac Banking Group from 2002 to 2003, and the Chief Executive Officer of Aberdeen Asset Management (Australia) Ltd, a division of Aberdeen Asset Management PLC from 2000 to 2001. From 1994 to 2000, Ms. Sananikone held senior positions at EquitiLink Group, which was later acquired by Aberdeen Asset Management PLC.

Ms. Sananikone is an experienced senior investment executive and board member with broad international experience in infrastructure industries and consortium arrangements. That experience allows her to inform our board on a wide range of governance, financial and operational issues, especially as they relate to the operations of our infrastructure businesses.

**Defendant Courtney**

47.     Defendant Richard D. Courtney ("Courtney") has served as the CEO of IMTT since February 2015.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers and/or directors of Macquarie and because of their ability to control the business and corporate affairs of Macquarie, the Individual Defendants owed Macquarie and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Macquarie in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Macquarie and its shareholders so as to benefit all shareholders equally.

49.     Each director and officer of the Company owes to Macquarie and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Macquarie, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers and directors of Macquarie were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Macquarie, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Macquarie's Board at all relevant times.

53.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

54.     To discharge their duties, the officers and directors of Macquarie were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Macquarie were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Macquarie's own Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Macquarie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Macquarie and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Macquarie's operations would comply with all applicable laws and Macquarie's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants further owed to Macquarie and the shareholders the duty of loyalty requiring that each favor Macquarie's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Macquarie and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, and directorial positions with Macquarie, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Macquarie.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants and

Defendant Courtney further aided and abetted and assisted each other in breaching the Individual Defendants' respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein, and Defendant Courtney aided and abetted such actions. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Macquarie was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

62.     Each of the Individual Defendants and Defendant Courtney aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant Courtney acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Macquarie, and was at all times acting within the course and scope of such agency.

## MACQUARIE'S CODE OF CONDUCT

64.     The Company's Code of Business Conduct (the "Code of Conduct") provides that it "applies to all directors, officers and employees" of the Company.

65.     The Code of Conduct provides, as to "Compliance with Laws and Regulations that Govern Business Operations," that:

We comply with the laws and regulations that apply to our business operations.

Examples include:

- Operations, service requirement and rates charged by regulated utilities.

- Laws and regulations that apply to environmental protection and safety.

- Laws prohibiting bribery, theft, fraud and insider trading.

- Laws requiring accurate financial records and reports to investors.

Each MIC operating division has responsibility to identify and manage its regulatory compliance obligations, including the development of policies and procedures, allocation of resources, training for employees, timely and accurate filing of reports to regulatory agencies, monitoring of compliance processes, and response to reports of non-compliance.

66.     The Code of Conduct provides, as to "Disclosures to Shareholders and Regulators," that:

MIC is committed to full, fair, accurate, timely and understandable disclosure for use in all public communications, and in submittals to the U.S. Securities and Exchange Commission (SEC).

MIC is also committed to the integrity of our system of accounting and internal controls; our accounting and financial records must be valid, accurate and complete. MIC is committed to filing accurate and timely reports to all government agencies that regulate MIC's business operations, including public utility commissions,

environment and safety agencies, the Federal Aviation Administration, port authorities and other regulators to which we report information.

MIC's Disclosure Policy provides more specific guidance about filings with the SEC and reports to shareholders.

MIC employees should:

- Provide full, fair, accurate, timely and understandable information for use in MIC's public communications, reports and filings with regulatory agencies.

- Never make any deletions or alterations to documents, registrations, records or systems for the purpose of inducing MIC employees or third parties to have an erroneous or partial understanding of any subject based on these documents, registrations, records and systems.

MIC's General Counsel should be consulted prior to any public disclosure of information concerning MIC.

67.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

68.    Macquarie owns and operates a diversified portfolio of infrastructure and infrastructure-like businesses.  The Company's portfolio of businesses provides services to other businesses, government agencies, and individuals primarily in the United States.

69.    The businesses that Macquarie owns and operates are organized into four segments: IMTT, Atlantic Aviation, Contracted Power, and MIC Hawaii.  The Company's IMTT segment is a business providing bulk liquid terminalling to third parties at 17 terminals in the U.S and two in Canada.

21

**False and Misleading Statements**

***February 22, 2016 Press Release***

70.     On February 22, 2016, the Company issued a press release announcing is financial results for the fourth quarter and full year ended December 31, 2015, including, *inter alia*, a fourth quarter dividend of $1.15 per share.  The press release additionally touted that dividends had increased 14.7% from 2014 to 2015 and that in the last nine quarters Macquarie had increased its dividend.

71.     Defendant Hooke further touted the Company's results and growth, stating, in relevant part, "We are pleased to have grown our dividend in excess of our guidance . . . .  What is most pleasing is that the increase has been underpinned by substantial growth in the Free Cash Flow generated by our businesses. That growth has been achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure—namely, that it is an inherently more stable asset class."

72.     Defendant Hooke additionally commented on Macquarie's IMTT segment, stating, in relevant part:

> "The performance of IMTT in both the quarter and the full year periods reflects the downstream services nature of the business overall, as well as the extent to which it is uncorrelated with the exploration and production (E&P) portion of the oil industry," . . . . "While upstream E&P companies are under considerable financial pressure, the vast majority of the hydrocarbons stored at IMTT have already been refined. Given the refined product focus, IMTT saw no signs of counter-party distress during 2015."

73.     The press release additionally noted that the Company's IMTT business had experienced "improvements in firm commitments including increased utilization rates of 94.9% at year end 2015 compared with 92.5% at year end 2014."

22

*February 23, 2016 Form 10-K*

74.     On February 23, 2016, the Company filed its annual report on Form 10-K with the SEC for its 2015 fiscal year (the "2015 10-K"), signed by Defendants Hooke, Stewart, Stanley, Brown, Carmany, Lentz, and Sananikone.

75.     The 2015 10-K reported total revenue of $1.64 billion and a net income loss of $113.81 million, with $550 of total revenue and $74.1 million in net income coming from IMTT.

76.     The 2015 10-K also downplayed the impact of volatility in petroleum prices on the Company's IMTT segment, stating, in relevant part:

> Although IMTT's core business of storing and handling refined petroleum products continued to perform well in 2015, the sizeable and largely unforeseen volatility in petroleum product prices recently has impacted IMTT and the bulk liquid terminals industry in several ways. First, uncertainty among industry participants generally has led to a reduction in the average duration of storage and related services contracts. While the shortening of contracts results in a modest increase in re-contracting risk, the essential services nature of the business and continued strong demand for the products stored serves to offset this risk.

> Second, specific ancillary services have been adversely affected by the decline in the price of crude oil in particular. At IMTT this has resulted in a reduction in the demand for rail services in support of crude oil that primarily originates in Canada. However, such services represent less than 3% of the business' total revenue.

77.     The 2015 10-K additionally noted that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

78.     Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hooke and Stewart attesting to the accuracy of the 2015 10-K.

*February 23, 2016 Earnings Call*

79.     On February 23, 2016, the Company held an earnings call to discuss its fourth quarter and fiscal year 2015 financial results.  During the call, Defendant Hooke commented positively on the stability of IMTT utilization rates, stating:

> [U]tilization remains high, firm commitments are up, and the cold snap in the Northeast, shortlived though it was, was a mild positive from a heating revenue point of view.  But none of this should come as a huge surprise.  This is not a business that is sensitive to what is going on in the exploration and production, or in interstate product movement.  It is a business that has some sensitivity to enduser demand, but least in the petroleum segment of its operations.

80.     Defendant Hooke continued to tout IMTT, stating, in relevant part, "In short, we feel confident in the continued stable contribution from IMTT to our overall results.  The business is simply not the macro economically sensitive enterprise that has been implied in the strong correlation of our share price with those in the [master limited partnership] world."

81.     Also during the call, Defendant Hooke noted that IMTT "is likely to continue to perform well and continue to serve as a platform for capital deployment," in addition to noting that its IMTT segment was "seeing growth in end user demand."

*April 1, 2016 Proxy Statement*

82.     On April 21, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement").  The 2016 Proxy Statement failed to disclose that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls.

83.     Regarding the Company's Code of Conduct, the 2016 Proxy Statement asserted that the Company has a "code of ethics and conduct that sets forth our commitment to ethical business practices.  Our code of ethics and conduct applies to our directors, officers and employees, including our chief executive officer and chief financial officer . . . ."

84.     The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

85.     The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to pay management fees linked to Macquarie's market capitalization while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

### *May 12, 2016 Investor Day Conference*

86.     On May 12, 2016, the Company held an Investor Day conference, during which Defendant Courtney touted the stability of IMTT utilization rates and downplayed potential issues arising from market changes affecting the demand for heavy residual oils, stating, in relevant part, "Most of the problems that are happening right now is affecting the upstream, crude, exploration and the gathering.  For us, we are kind of downstream.  Our assets are in a different part of the logistics and distribution chain."

25

*August 30, 2016 Three Part Advisors Midwest IDEAS Investor Conference*

87.    On August 30, 2016, the Company participated in the Three Part Advisors Midwest IDEAS Investor Conference, during which Defendant Davis eased concern surrounding the impact of changes in the petroleum market on the Company's IMTT segment, stating that IMTT "stores and handles a variety of refined petroleum, chemical and vegetable and animal oils," and that IMTT "is a downstream business, we are dealing in refined products and demand for refined products has likely been quite strong.  So this business has performed well throughout this period of time.  Bear in mind when you see anomalous moves in the share price."

88.    Defendant Davis continued, "[d]emand for storage is high, as you can imagine. You read about it every day usually in the context of crude oil but also as it pertains to refined product."  Davis also noted that an IMTT utilization rate between 94% and 96% is "normal."

*February 21, 2017 10-K*

89.    On February 21, 2017, the Company filed its annual report on Form 10-K with the SEC for fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Hooke, Stewart, Stanley, Brown, Carmany, Kirk, Lentz, and Sananikone.

90.    The 2016 10-K reported total revenue of $1.6 billion and a net income of $154 million, with $532.5 of total revenue and $83.1 million in net income coming from IMTT.

91.    The 2016 10-K also touted IMTT customer stability, stating, in relevant part:

For the year ended December 31, 2016, approximately 55% of IMTT's revenue was generated by its top ten customers of which seven were rated as investment grade and the other three were not rated. Customers typically sign contracts which, among other things, provide for a fixed periodic payment (usually monthly) for access to and use of IMTT's facilities. This payment may be expressed in terms of cents per barrel of storage capacity, a dollar amount per unit of infrastructure, or a dollar amount per month. These amounts are payable whether the customer uses the facilities or not.

92.     The 2016 10-K additionally noted that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

93.     Attached to the 2016 10-K were SOX certifications signed by Defendants Hooke and Stewart attesting to the accuracy of the 2016 10-K.

***February 22, 2017 Earnings Call***

94.     On February 22, 2017, the Company held an earning call to discuss its fourth quarter and full year 2016 financial results.  During the call, Defendant Hooke commented on the stability of IMTT and its utilization rates, noting that IMTT's "utilization remained very strong" and that "[s]torage prices were stable, with pricing on renewal stepping up in line with inflation." Defendant Hooke further noted that "[u]tilization remained at the high end of historically normal levels at 96.4% at year end."

95.     During the call, in response to an analyst question regarding IMTT utilization and the reasons for IMTT utilization reverting to historic mean levels, Defendant Hooke noted that IMTT utilization rates "will revert to historically normal levels . . . because things generally revert to historically normal levels.  There's nothing we see coming down the pipe that says that this is why we'll revert to historically normal levels.  It's just that eventually things will revert to the mean.  I would say that's were it's at."

96.     Defendant Hooke also noted during that call that "we have every incentive to keep those tanks as full as we can, and we will."

***The 2017 Proxy Statement***

97.     On March 24, 2017, the Company filed its 2017 Proxy Statement. The 2017 Proxy Statement failed to disclose that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the

market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls.

98.     Regarding the Company's Code of Conduct, the 2017 Proxy Statement asserted that the Company has a "code of business conduct that applies to our directors, officers and employees, including our chief executive officer and chief financial officer . . . ."

99.     The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

100.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to pay management fees linked to Macquarie's market capitalization while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

### *May 10, 2017 Oppenheimer Industrial Growth Conference*

101.     On May 10, 2017, Macquarie participated in the Oppenheimer Industrial Growth Conference, during which Defendant Davis noted that "utilization rates are at very high levels" and that they would remain high into the year 2018 because "the basic services nature of this

business—its capital intensity and the very high barriers to entry into this business—provide us with good visibility into its cash generation and opportunities for growth over time."

### May 18, 2017 Three Part Advisors East Coast IDEAS Investor Conference

102.    On May 18, 2017, the Company participated in the Three Part Advisors East Coast IDEAS Investor Conference, during which Defendant Davis stated that "utilization rates have remained very, very high, and they're currently over 96%, which is to say we don't have space for anything else at this point in time."   Defendant Davis also noted that Macquarie has "good visibility" into "macroeconomic factors influencing supply and demand more broadly" to show IMTT's stability.

103.    Defendant Davis also noted during the call that utilization rates would remain high into the year 2018 because, "the basic services nature of the business gives us good visibility," and also noted that IMTT facilities have "no commodity exposure directly" because they "simply provide[ ] access to storage capacity."

### June 27, 2017 JP Morgan Energy Equity Investor Conference

104.    On June 27, 2017, the Company participated in the JP Morgan Energy Equity Investor Conference, during which Defendant Stewart noted that "utilization for us remains at the high end of historical range" and that "the market is one that's in relative equilibrium at the moment."

105.    In further touting the Company's IMTT segment, Defendant Stewart noted that it "benefit[s] from stable, generally growing demand and typically very favorable competitive dynamics."   Stewart noted that the "effective execution of this strategy has led to attractive levels of growth in cash generation, dividends and the MIC share price.   Each of free cash flow and dividends have grown at a midteens pace over the past 5 years."   Moreover, Stewart commented

that Macquarie's "guidance for 2017, shown here at the midpoint for free cash flow and forecast 10% for dividends, is wholly consistent with our historic performance."

### August 3, 2017 Earnings Call

106.    On August 3, 2017, the Company held an earnings call to discuss its financial results for its fiscal second quarter ended June 30, 2017, during which Defendant Hooke commented on IMTT's exposure to petroleum market fluctuations.   In response to an analyst question concerning whether "there are any commodity-driven factors that would cause a decline in utilization," Defendant Hooke replied, "No, no. The totality of the change in utilization was driven by tanks offline for tank cleaning and inspection.  But the other I would—so there's no— well, there's nothing—there's no other commodity noise or other noise or counter-party issues there.  It's purely that."

107.    Defendant Hooke further commented that "IMTT's operating results for the second quarter were a case of steady as she goes, a reversion to the mean in storage utilization, stable pricing and one small construction project termination that resulted in recognition of some deferred revenue."

### August 31, 2017 Three Part Advisors Midwest IDEAS Investor Conference

108.    On August 31, 2017, the Company participated in the Three Part Advisors Midwest IDEAS Investor Conference, during which Defendant Davis noted that "utilization has been very, very stable.  Generally speaking, where we are toady at about 94% in utilization is consistent with historically normal."  Concerning the stability of Macquarie and the sustainability of its dividend, Defendant Davis stated that "what you've got there is a stable and growing cash generation from some very basic services kind of businesses where we're being traded today, of course, I think most people would suggest is an attractive yield leading to that mid- to high-teens kind of a total

opportunity—total return kind of an opportunity, very much consistent with what we've been doing for the past 13 years."

### *November 1, 2017 Form 10-Q*

109.    On November 1, 2017, the Company filed its quarterly report with the SEC on Form 10-Q for its fiscal third quarter ended September 30, 2017 (the "3Q 2017 10-Q"), signed by Defendants Hooke and Stewart.

110.    The 3Q 2017 10-Q noted that the Company was issued a dividend of $1.42 per share for the quarter, which was a 10.1% increase over the dividend issued during the same period the prior year.   The 3Q 2017 10-Q additionally reported total revenue of $453 million and net income of $36 million, with $134 million of revenue and $20 million of net income coming from IMTT.

111.    The 3Q 2017 10-Q also commented on IMTT's stability and utilization rates, stating, "We expect utilization levels to be approximately 94% over the long term, as they have been historically."

112.    Attached to the 3Q 2017 10-Q were SOX certifications signed by Defendants Hooke and Stewart attesting to the accuracy of the 3Q 2017 10-Q.

### *November 2, 2017 Earnings Call*

113.    On November 2, 2017, the Company held an earnings call discussing its third quarter 2017 financial results, during which Defendant Hooke stated that the "primary driver" in a small drop in IMTT utilization in the quarter was that "[t]wo of these tanks were out of service for a portion of the third quarter."   Defendant Hooke noted, "keep in mind that the decline in utilization was not outside the historically normal utilization range of between 92% and 94%."

114.    During the call, Defendant Hooke also commented on Macquarie's dividend policy, stating, "I think across the period I've been here, you've never seen us make radical lurching changes of, sort of, revisiting capital policy and dividend policy, et cetera.  I would be pretty surprised if anything changes going forward."

115.    Also during the call, Defendant Hooke was asked by an analyst whether the Company will follow a market "pivot towards what the market values and not as much maximizing dividend growth but more retaining cash flow and having stronger financials," to which Defendant Hooke replied:

> I don't think you'll see us imitate too many others over time. I think our view is fads come and go as to what's popular. Exuberant dividend growth at all costs where people were urging us to guide to 7 years' visibility of 20% plus dividend growth, we never did that. People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that. I don't think we will get into any of those fads. I would say that some of the midstream firms are sort of having to take, today, some pain for some decisions they've taken in the past that we haven't taken. Remember that sort of 60% of our business or so is not midstream.

***November 16, 2017 Three Part Advisor Southwest IDEAS Investor Conference***

116.    On November 16, 2017, the Company participated in the Three Part Advisor Southwest IDEAS Investor Conference, during which Defendant Davis again noted that IMTT's utilization rates were stable and that the "basic nature of this business, combined with inflation-linked escalators in those contracts . . . provide us with very good visibility into the cash generating capacity of this business over a longer period of time."

117.    Defendant Davis also noted that Macquarie's history of authorizing "pretty consistent increases in the dividend" and that Macquarie usually returns "between 75% and 85% of the cash produced" as a quarterly cash dividend.

**The Truth Emerges**

118.    On February 21, 2018, the Company issued a press release announcing disappointing earnings of $0.43 per share for the fourth fiscal quarter ended December 31, 2018, and that Macquarie would be lowering its dividend for the quarter.

119.    Macquarie noted the loss of "half a dozen" IMTT contracts at its Louisiana storage facility as a result of a decline in the No. 6 fuel oil segment as the principal explanation for the Company's poor performance.

120.    Macquarie, in an effort to dispel concerns about the loss of the IMTT customers, stated that it was "an issue having to do with one product, in one market, in one of our businesses." The impact of the decline in No. 6 fuel oil to the Company's business long-term, however, was evident when Macquarie announced that it would likely be cutting its dividend 31% from the fourth quarter 2017 to the first quarter 2018, providing guidance for a dividend of $1.00 per share, per quarter, in 2018, and that the Company "intend[s] to repurpose certain of the assets of our bulk liquid terminals business." The Company noted that the decision to reduce its 2018 dividend was made in favor of "internally funding the repurposing of the assets at [IMTT] and to take advantage of the incentives to invest in growth projects that are a part of recent tax reform," and noted that it "strikes a balance between continuing to return the majority of our Free Cash Flow to shareholders in the form of a dividend and strengthening our balance sheet in support of future dividend growth."

121.    As noted on February 22, 2018 by Christopher Frost, the current CEO of the Company, Macquarie was "better off repurposing these 6 Oil tanks now, given the long-term structural decline of this product."

122.    On this news, the price per share of Macquarie stock fell $26.21 per share, or approximately 41.2%, from the previous day's closing price, closing at $37.41 per share on February 22, 2018.

123.    The statements referenced in ¶¶ 70-81, 86-96, and 101-117 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls.

## DAMAGES TO MACQUARIE

124.    As a direct and proximate result of the Individual Defendants' conduct, Macquarie will lose and expend many millions of dollars.

125.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its former CEO, its Head of Investor Relations and Vice President, its CFO, and the CEO of IMTT, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

127. Further, the Company was damaged by the false and misleading statements made in the 2016 Proxy Statement and the 2017 Proxy Statement, as they induced shareholders to reelect Defendants to the Board who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

128. As a direct and proximate result of the Individual Defendants' conduct, Macquarie has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

129. Plaintiff brings this action derivatively and for the benefit of Macquarie to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Macquarie, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

130. Macquarie is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131. Plaintiff is, and has been at all relevant times, a shareholder of Macquarie. Plaintiff will adequately and fairly represent the interests of Macquarie in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

132. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

133.   A pre-suit demand on the Board of Macquarie is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Individual Defendants Stanley, Brown, Carmany, Kirk, Lentz, and Sananikone (the "Director-Defendants"), and non-parties Christopher Frost ("Frost"), Amanda K. Brock, and Maria J. Dreyfus (collectively with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine directors who were on the Board at the time this action was commenced.

134.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

136.   The Director-Defendants knew of the falsity of the misleading statements at the time they were made. The Company's IMTT segment was an integral part of the Company's business, accounting for a significant portion of the Company's revenue and net income, and was highly material to the Company's core operations.

137.    As Board members of Macquarie, charged with overseeing the Company's affairs, the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Macquarie, the Director-Defendants must have been aware of the material facts regarding the Company's IMTT business.

138.    This inference of actual knowledge of the misleading statements and omissions at issue is supported by the sudden and unexplained departure of Defendant Hooke as CEO, just a few months prior to the truth emerging in February 2018.

139.    Therefore, the Director-Defendants each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

140.    Additional reasons that demand on Defendant Stanley is futile follow. Defendant Stanley has served as a Company director since July 2013 and as the Company's Chairman since July 2014.  He is thus, as the Company admits, a non-independent director.  His large Company stock holding, worth at least $368.4 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Stanley signed, and thus personally made the false and misleading statements in, the 2015 and 2016 10-Ks that are referenced herein. Thus, for these reasons, too, Defendant Stanley

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since December 2004, and is Chair of the Audit Committee and a member of the Compensation Committee and the Nominating and Governance Committee.   He receives handsome compensation, including $262,365 in 2017.   His large Company stock holding, worth at least $3.8 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Brown signed, and thus personally made the false and misleading statements in, the 2015 and 2016 10-Ks that are referenced herein. Thus, for these reasons, too, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Carmany is futile follow. Defendant Carmany has served as a Company director since December 2004, and is Chair of the Nominating and Governance Committee and a member of the Audit Committee and the Compensation Committee.   He receives handsome compensation, including $244,865 in 2017.   His large Company stock holding, worth at least $3.4 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Carmany signed, and thus personally made the false and misleading statements in, the 2015 and 2016 10-Ks that are referenced herein. Thus, for these reasons, too, Defendant Carmany breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Kirk is futile follow. Defendant Kirk has served as a Company director since November 2016, and is a member of the Nominating and Governance Committee, the Audit Committee, and the Compensation Committee.  He receives handsome compensation, including $235,865 in 2017.  His large Company stock holding, worth at least $78,536 before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Kirk signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced herein. Thus, for these reasons, too, Defendant Kirk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Lentz is futile follow. Defendant Lentz has served as a Company director since August 2011, and is a member of the Nominating and Governance Committee, the Audit Committee, and the Compensation Committee.  He receives

handsome compensation, including $237,865 in 2017. His large Company stock holding, worth at least $1.8 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Lentz signed, and thus personally made the false and misleading statements in, the 2015 and 2016 10-Ks that are referenced herein. Thus, for these reasons, too, Defendant Lentz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.   Additional reasons that demand on Defendant Sananikone is futile follow. Defendant Sananikone has served as a Company director since February 2013, and is Chair of the Compensation Committee and a member of the Nominating and Governance Committee and the Audit Committee. She receives handsome compensation, including $244,865 in 2017. Her large Company stock holding, worth at least $781,801 before the fraud was fully exposed, reveals her interest in keeping the Company's stock price as high as possible. As a long-time Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Sananikone signed, and thus personally made the false and misleading statements in, the 2015 and 2016 10-Ks that are referenced herein. Thus, for these reasons, too, Defendant Sananikone breached her fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Frost is futile follow.  Frost is the current CEO of the Company, and this position is his principal means of occupation and principal source of income.  Thus, Frost is not independent or disinterested, and demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on the Board is futile follow.

148.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

149.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

150.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the

Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

151.    Macquarie has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Macquarie any part of the damages Macquarie suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

152.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

153.    The acts complained of herein constitute violations of fiduciary duties owed by Macquarie's officers and directors, and these acts are incapable of ratification.

154.    The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Macquarie. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by

the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Macquarie, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

155.    If there is no directors' and officers' liability insurance, then the Directors will not cause Macquarie to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

156.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

159.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

160.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

161.    Under the direction and watch of the Directors, the 2016 Proxy Statement and 2017 Proxy Statement failed to disclose that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls.

162.    The Individual Defendants also caused the 2016 Proxy Statement and the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to pay management fees linked to Macquarie's market capitalization while failing to

disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

163.    Moreover, both the 2016 Proxy Statement and 2017 Proxy Statement were false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

164.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy Statement and 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement and 2017 Proxy Statement, including election of directors, approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

165.    The false and misleading elements of the 2016 Proxy Statement led to the re-election of Defendants Brown, Carmany, Lentz, and Sananikone, which allowed them to continue breaching their fiduciary duties to Macquarie.

166.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Brown, Carmany, Kirk, Lentz, and Sananikone, which allowed them to continue breaching their fiduciary duties to Macquarie.

167.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement and 2017 Proxy Statement.

168.    Plaintiff on behalf of Macquarie has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Macquarie's business and affairs.

171.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Macquarie.

173.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

174.    In further breach of their fiduciary duties owed to Macquarie, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the performance and utilization of the Company's IMTT segment were at risk of significant decline as a result of ongoing changes industry-wide in the market for heavy residual oils—specifically the declining demand and pricing for No. 6 fuel oil; (2) the Company relied heavily on the demand for storage of heavy residual fuel oils; (3) considerable capital expenditures would need to be undertaken by

the Company to repurpose its IMTT storage tanks in order to store different products; and (4) the Company failed to maintain internal controls

175.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

176.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Macquarie's securities.

177.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Macquarie's securities.

178.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Macquarie has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.     Plaintiff on behalf of Macquarie has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

181.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Macquarie.

183.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Macquarie that was tied to the performance or artificially inflated valuation of Macquarie, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.     Plaintiff, as a shareholder and a representative of Macquarie, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185.     Plaintiff on behalf of Macquarie has no adequate remedy at law.

**FOURTH CLAIM**

**Against Defendant Courtney for Aiding and Abetting Breach of Fiduciary Duty**

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    Defendant Courtney aided and abetted the Individual Defendants who breached their fiduciary duties to Macquarie.

188.    Defendant Courtney's misconduct resulted in continuous, connected, and on-going harm to the Company.

189.    Specifically, Defendant Courtney made false and misleading statements and omissions regarding IMTT.  As the CEO of IMTT, he was also aware of Macquarie's false and misleading statements and material omissions concerning IMTT.

190.    Defendant Courtney is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

191.    As a direct and proximate result of Defendant Courtney's aiding and abetting of Macquarie's directors' and officers' breaches of duty alleged herein, Macquarie has sustained and will continue to sustain substantial damages.

192.    Plaintiff of behalf of Macquarie has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Macquarie, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided

and abetted the breach of their fiduciary duties to Macquarie;

        (c)     Declaring that Defendant Courtney aided and abetted the Individual Defendants' breach of their fiduciary duties to Macquarie;

        (d)     Determining and awarding to Macquarie the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

        (e)     Directing Macquarie and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Macquarie and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        2. a provision to permit the shareholders of Macquarie to nominate at least five candidates for election to the Board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

        (f)     Awarding Macquarie restitution from the Individual Defendants, and each of them;

        (g)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)      Granting such other and further relief as the Court may deem just and proper.

Dated: October 12, 2018

**THE ROSEN LAW FIRM, P.A.**

<u>/s/ Phillip Kim</u>
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Raymond Greenlee am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of October 2018.

10/11/2018  9:09:54 AM PDT

DocuSigned by:

5E7E6FF400934EC

Raymond Greenlee